## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **SEALED,** | § | |
| **Plaintiffs,** | § | **Civil Action No.** |
| | § | **19-CV-479** |
| | § | |
| | § | |
| | § | **FILED _IN_ CAMERA** |
| | § | **AND UNDER SEAL** |
| **v.** | § | |
| | § | |
| | § | |
| | § | **Pursuant to** |
| | § | **31 USC §3730(b)(2)** |
| | § | |
| **SEALED,** | § | |
| **Defendants.** | § | **Jury Trial Demanded** |
| | § | |

## ATTENTION SEAL CLERK

## FILED IN CAMERA AND UNDER SEAL

## FALSE CLAIMS ACT COMPLAINT

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| | § | CIVIL ACTION NO. |
| | § | 19-CV-479 |
| THE UNITED STATES OF AMERICA | § | |
| AND THE STATE OF TEXAS | § | |
| TONY WAHL, RELATOR | § | |
| | § | ALL PLEADINGS AND |
| | § | MOTIONS FILED |
| PLAINTIFFS | § | |
| | § | FILED IN *CAMERA* AND |
| | § | SEAL PURSUANT TO |
| v. | § | 31 U.S.C. § 3730(b)(2) |
| | § | |
| | § | |
| CHRISTUS TRINITY MOTHER | § | |
| FRANCES HEALTH SYSTEM, | § | JURY TRIAL |
| CHRISTUS TRINITY MOTHER | § | DEMANDED |
| FRANCES HOSPITAL – TYLER, | § | |
| CHRISTUS TRINITY CLINIC, | § | |
| TRINITY MOTHER FRANCES | § | |
| FOUNDATION AND CHRISTUS | § | |
| HEALTH | § | |
| | § | |
| | § | |
| DEFENDANTS | § | |
| | § | |
| | § | |
| | § | EX PARTE & UNDER SEAL |
| | § | |
| | § | |
| | § | |
| | § | |

FALSE CLAIMS ACT COMPLAINT

## INTRODUCTION

Plaintiff-Relator Tony Wahl ("Relator" or "Plaintiff"), through his undersigned attorney, on behalf of the United States of America ("United States"), and the State of Texas for his Complaint against Defendants Christus Trinity Mother Frances Health System, Christus Trinity Mother Frances Hospital – Tyler, Christus Trinity Clinic, Trinity Mother Frances Foundation and Christus Health (collectively "CTMF"), alleges as follows:

### I.    PRELIMINARY STATEMENT

1.  This is a civil action brought by the Relator, Tony Wahl against Christus Trinity Mother Frances Health System, Christus Trinity Mother Frances Hospital – Tyler, Christus Trinity Clinic, Trinity Mother Frances Foundation and Christus Health (collectively "CTMF" or the "Defendants") under the False Claims Act, 31 U.S.C. §3729 et seq. (the "FCA"), and the common law to recover treble damages sustained by, and civil penalties and restitution owed to, the United States and the State of Texas. This action is based on CTMF's violations of the Federal Anti-Kickback Statute 42 U.S.C. §1320a-7b(b) (the "AKS"), the Texas Medicaid Fraud Prevention Act (Tex. Human Res. Code, Ch. 36. §36.101 et seq.), the Texas Patient Solicitation Act (Tex. Occ. Code, Ch. 102.001 et seq.), for engaging in a kickback scheme with independent school districts, colleges and other educational institutions (collectively "Educational Institutions") to induce the Educational Institutions to; enter into exclusive athletic services and healthcare provider agreements ("Athletic Trainer Agreements") as well as related exclusive "Sponsorship Agreements" or "Marketing Agreements" with school districts, colleges and universities, all in an effort to secure referrals, and steerage of Medicare, Medicaid, private pay and commercial payor patient referrals. These patient referrals would include students, athletes, employees and family members of the exclusively contracted Educational

Institutions. CTMF is reimbursed by Medicare, Medicaid and TRICARE, as well as commercial payors for healthcare services rendered by CTMF to the Educational Institutions, students, athletes, employees and family members.

2.  This action is brought to recover losses sustained by health benefit programs funded in whole or in part by the U.S. and the State of Texas, including Medicare, Medicaid and TRICARE (collectively "Governmental Healthcare Programs"). Additionally, various commercial payors, such as Blue Cross Blue Shield, Cigna, AETNA and employer self-funded payors have also suffered losses (collectively "Commercial Payors"), collectively Governmental Healthcare Programs and Commercial Payors are referred to as "Payors". The Payors have all suffered losses due to the violation of the Federal and State Anti-Kickback Statutes and the Federal False Claims Act, due to the fact, and as a result of, the Defendants having offered and paid kickbacks in exchange for healthcare services that are ultimately paid by both Governmental Healthcare Programs and Commercial Payors.

3.  Specifically, as a part of a strategy to win and keep exclusive contracts for the referral and/or steerage of patients, CTMF has obtained at least twenty (20) exclusive contracts with various Educational Institutions (including Tyler ISD, Chapel Hill ISD, Whitehouse ISD, Overton ISD, Lindale ISD and Jacksonville ISD). CTMF, for just Tyler, Whitehouse, Chapel Hill and Overton, has obtained for all intents and purposes, the exclusive access to over 27,000 students, and over 3,600 teachers (total of over 30,600 potential customers/patients). This does not include the related family members of students and teachers, which could easily be another 30,600. This scheme results in just four (4) schools listed with CTMF having exclusive access to over 60,000 potential customers/patients. In particular, many of the Educational Institution's student populations have a rate of economically disadvantaged students greater than sixty (60%)

percent, which typically indicates such populations are offered, and/or receive, Medicaid or Medicare services.

4. CTMF has offered and paid, and the Educational Institutions have agreed to receive, illegal kickbacks. These kickbacks have been comprised of **cash**, donations, **free** services, **free** physicians, **free** athletic trainers, **free** apparel and **free** equipment. This illegal scheme is run by executives including, several Christus Health Senior Officers, the President of CTMF, and by the previous CTMF CEO and COO (both of whom were subsequently employed by Christus Health and both of whom were provided severance agreements upon retirement in excess of $11 million). This is by definition the essence of patient steerage and obtaining of patient referrals (in illegal manner). Upon information belief, over 100,000 illegal referrals are in issue with this scheme.

5. Relator has been a senior executive for a number of healthcare facilities and is an accountant. He has served as a CFO for both for-profit and non-profit hospitals and hospital systems. He currently is the CEO of a for-profit physician owned hospital. Relator has complied with all service requirements for the Federal government and the State of Texas which are parties to the Complaint.

6. Based upon the Relator's experience as the CEO of a large regional healthcare system, and as CEO of a physician owned hospital, having exclusive access to an Educational Institution is potentially very lucrative to the hospital. The hospital can have its hand-picked affiliated physicians and representatives, as well as trainers and other healthcare personnel, onsite and with access to a captive population of the Educational Institutions. This captive population is typical of the hospital's payors. Typically ten (10%) percent of the captive population would have Medicaid as a healthcare payor, sixty (60%) percent would have Medicare and the remainder of the population would have commercial payors

as healthcare providers. In this instance, when CTMF pays kickbacks to Educational Institutions, CTMF damages other healthcare providers as well as the Government (both state and federal) because of the overutilization of diagnostic, physician, hospital and other healthcare services.

7. As set forth more fully below, from at least 2004 to the present; CTMF and its predecessor entity Trinity Mother Frances Health System have aggressively sought to enter exclusive Athletic Trainer Agreements, Agreements to provide Team Physicians, Sponsorship Agreements and Marketing Agreements (collectively referred to as "Marketing Agreements") with the Educational Institutions by providing "**free**" or "**no cost**" athletic trainers, graduate assistant athletic trainers, PRN clinic athletic trainers, **free** apparel, **free** dedicated team physicians (who are employees of Christus Trinity Clinic), **free** injury clinics, **free** physical exams, **free** educational training, athletic insurance (in exchange for referrals to CTMF – ERs, CTMF hospital services, CTMF orthopedic specialists, CTMF special test including MRIs, CTs; and CTMF physical therapy), **free** weekly clinics, **free** training room supplies, **free** rehab equipment, **free** access to mobile athletic training room, athletic facilities donations, **actual cash** payments to the schools, payments for signage, all in an effort to gain more referrals and patients for the CTMF related healthcare entities and providers, by characterizing such "**free**" services as marketing, when in fact such agreements on their face are clearly kickbacks, pursuant to Quid Pro Quo arrangements.

8. "Quid Pro Quo arrangements for the referral of health care business are illegal." *Press Release, U.S. Attorney's Office Eastern District Texas*, Monday, August 27, 2018. (*U.S. ex. Rel. Dean v. Paramedics Plus, LLC*, et al 4:14-CV-203.)

9.  In a very similar situation as the facts presented in this Complaint, the Office of Inspector General, noted that: Arrangements in which laboratories  (or a Hospital System)  provide free or below-market goods or services to physicians  ( a referral source such as a local ISD) or make payments to physicians  (ISD)  that are not commercially reasonable in the absence of federal healthcare program referrals potentially raise four major concerns typically associated with kickbacks: **1. corruption of medical judgment 2. overutilization, 3. increased costs to the federal healthcare programs and beneficiaries, and 4. unfair competition.** *OIG, Special Fraud Alert: Laboratory Payments to Referring Physicians*, June 25, 2014.  (emphasis noted in bold).

10. The OIG also notes, just as the facts set forth in this Complaint, that claims that include items or services resulting from a violation of the anti-kickback statute are not payable by Medicare and may constitute false claims under the False Claims Act, even if the items or services are medically necessary Id, Citing, 31 U.S.C. 3729 et seq. A fifth factor is also often cited by the OIG as a practical problem with offering and paying kickbacks, is not surprisingly ***Patient Steerage***.  *OIG, A Roadmap for New Physicians, Fraud and Abuse Laws*.

11. The Provision of free or below market value services and payments are illegal kickbacks under federal and state laws.

12. As a direct result of the Defendants violations of the FCA, the AKS, the Texas AKS and Texas Medicaid Fraud Prevention Act, the U.S. and the State of Texas treasuries have sustained substantial monetary damages. The U.S., the State of Texas and the Relator (collectively "Plaintiffs") seek treble damages, civil penalties and such other and further relief they may be entitled to as the result of the Defendant's False Claims made in violation of the Federal FCA.

13. Relator will serve a copy of this Complaint on the Federal government and the State of Texas which are parties to the Complaint.

14. As required by the False Claims Act, this Complaint is being filed under seal and shall not be served on the Defendants until the Court so orders.

15. The allegations contained herein are not based upon any public disclosure.

16. Unless otherwise stated herein, Relator is the original source of the information upon which this Complaint is based.

17. Unless otherwise stated herein, Relator has direct and independent knowledge on which the allegations herein are based and has voluntarily provided this information to the United States before filing this action, as required by the False Claims Act, 31 U.S.C. §3730(b)(2), on August 13, 2019.

18. Relator voluntarily disclosed substantial material evidence and information that he possessed on the illegal kickback scheme conducted by Defendants on Nathan Kummerfeld, Assistant United States Attorney for the Eastern District of Texas and the Assistant United States Attorney for the Eastern District of Texas, James Gillingham, including a statement of all material evidence and information related to the Complaint. This disclosure statement is supported by material evidence known to Relator at his filing establishing the existence of Defendant's false claims. Because the statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

## II.   JURISDICTION AND VENUE

19. This Court has jurisdiction over the claims brought under the False Claims Act 31 U.S.C. §3729 et seq., and pursuant to 31 U.S.C. §3730(a) and 28 U.S.C. §§1331 and 1345, and over the remaining claims pursuant to 28 U.S.C. §1345.

20. Venue lies in this District pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §§1391(b) and 1391(c), because all of the Defendants reside in and do business in this District and one or more of the false or fraudulent acts at issue occurred in this District.

## III.   PARTIES

21. Relator is a resident of Texas and resides in Bullard, Smith County, Texas. The Relator brings this action based on his direct, independent, and personal knowledge and also on information and belief. Relator is an original source of this information to the United States. He has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under the False Claims Act which is based on the information.

22. Defendant, Christus Trinity Mother Frances Health System ("TMF System") is a Texas non-profit corporation, which is a large regional healthcare system in East Texas, headquartered in Tyler, Texas and does business throughout East Texas, including the Eastern District of Texas. Its principle place of business is located at NorthPark Medical Plaza, 910 E. Houston St., Tyler, Texas, 75702.

23. Defendant Christus Trinity Mother Frances Hospital ("TMF Hospital") is a Texas non-profit corporation based in Tyler, Texas. TMF Hospital is a large inpatient acute care hospital. TMF Hospital's principle place of business is located at 800 E. Dawson St., Tyler, Texas, 75701, and does business in the Eastern District of Texas.

24. Defendant Christus Trinity Clinic ("Trinity Clinic") is a controlled Texas non-profit corporation multi-specialty physician clinic which directly employs over 650 physicians. It's principle place of business is located at 305 Rusk Street, Tyler, Texas, 75701, but it has clinic offices throughout East Texas including, Tyler, Whitehouse, Lindale, Jacksonville, Mineola, Canton, Longview, Emory, Holly Lake, Grapeland, Henderson, Marshall, Sulphur Springs, Fairfield, Winnsboro, New Boston, Gladewater, Hallsville, Texarkana, and does business in the Eastern District of Texas.

25. Defendant Trinity Mother Frances Foundation ("TMF Foundation") is a Texas non-profit corporation whose principle address is 100 E. Ferguson Suite 800, Tyler, Texas, 75702, and does business in the Eastern District of Texas.

26. Defendant Christus Health is a Texas nonprofit corporation whose principle address is 919 Hidden Ridge, Irving, Texas, 75038, and does business in the Eastern District of Texas. TMF System and its subsidiaries were acquired by Christus Health on May 1, 2016. This acquisition was structured as a member substitution agreement where Christus Health became the sole corporate member of TMF System. The consideration for this transaction was the donation of $50,000,000 to the Trinity Mother Frances Health System Foundation, now known as TMF Foundation ("Foundation"). The Foundation is controlled by Christus Health. Relator has directly sought the assistance of Chris Glenney [the previous CEO of TMF System and who on June 29, 2017 was the Senior Vice President of Group Operations for Christus Health and CEO of Christus Health Northeast Texas], in bringing to his attention the Athletic Trainer Agreements and compliance problems such agreements present under both federal and state laws. Relator's concerns have remained unaddressed, by Mr. Glenney.

## IV.    FACTUAL ALLEGATIONS

### A. The Anti-Kickback Statute and the False Claims Act

27. The FCA establishes liability to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," §3729(a)(1)(A); or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," §3729(a)(1)(B). "Knowingly" is defined to include actual knowledge, reckless disregard and deliberate indifference. §3729(b)(1). No proof of specific intent to defraud is required. *Id.*

28. **The AKS makes it illegal for individuals or entities to knowingly and willfully "offer or pay remuneration (including any kickback, bribe, or rebate) . . . to any person to induce such person . . . to purchase,. . . order, arrange for or recommend purchasing . . . or ordering any good, facility, service or item for which payment may be made in whole or in part under a Federal health care program.**" 42 U.S.C. §1320a-7b(b)(2). It also prohibits the payment of any remuneration "to any person" in exchange for such patient referrals. §1320a-7b(b)(2)(A). The State of Texas has a similar statute that mirrors the Federal AKS but it is not limited to Governmental Healthcare Programs. Both the Federal and State AKS prohibit the offer and payment of kickbacks. Compliance with the AKS is a condition of payment imposed by Governmental Healthcare Programs.

29. The provision of free, or below fair market value goods, services or personnel by the CMTF Hospital System, a CTMF Hospital or CTMF Clinic to any local Educational Institution to effectively gain referrals of patients for medical services, facilities, or procedures that will be billed to Governmental Healthcare Programs is an example of such illegal remuneration.

30. Violation of the AKS is a felony punishable by fines and/or imprisonment and can also result in exclusion from participation in Governmental Healthcare Programs. 42 U.S.C. §1320a-7b(b)(2) and 42 U.S.C. §1320a-7(b)(7).

31. The AKS is expansive in scope and clearly prohibits payments for referrals. Many of the federal courts who have interpreted the AKS have adopted the "one purpose" test, holding that the AKS is violated if "one purpose" of the payment in question was to induce referrals, irrespective of the existence of other legitimate purposes. *U.S. v. Greber*, 760 F. 2d. 68 (3rd Cr. 1985).[1]

32. The AKS arose out of congressional concern that remuneration given to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. The OIG has noted that paying kickbacks corrupts medical judgements, results in overutilization, increases costs to federal (and state) healthcare programs and beneficiaries, unfair competition and patient steerage. *See, fn[1] above*.

33. To protect the Medicare and Medicaid programs, among other Governmental Healthcare Programs, from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Publ. L. No. 92-603, §§242(b) and (c); 42 U.S.C. §1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Publ.

---

[1] In addition to the Third Circuit, the Fifth, Seventh, Ninth, and Tenth Circuits have also established the "one purpose" test. See, *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998); *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000).

L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

34. As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, §6402(f), 124 Stat. 119, codified at 42 U.S.C. §1320a-7b(g), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."

35. According to the legislative history of the PPACA, this amendment to the AKS was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. §10854.

36. Compliance with the AKS, 42 U.S.C. §1320a-7b(b), is a condition of payment under the Governmental Healthcare Programs.

37. Providing kickbacks to Educational Institutions by paying for and providing "**free**", "**no cost**" or **below fair market** value personnel, physicians, employees, services, equipment, facilities, items, sponsorships, cash and the like ("kickbacks"), CTMF had the intended effect to induce the local Educational Institution's employees, family members, students and athletes to utilize CTMF healthcare services, CTMF healthcare facilities,  CTMF items, CTMF products, CTMF physicians, CTMF healthcare providers, and related CTMF healthcare entities, causing false claims to be submitted to federal (and state) healthcare programs.

38. The Defendants' kickbacks undermine the free market and results in unfair competition by paying kickbacks in order to obtain healthcare business.

39. The kickbacks also undermine critical independence of physician/patient decision making and ultimately raise healthcare costs. Clearly CTMF does not give "**free**", "**no**

cost" or **below fair market** value services to a referral source without expecting something in exchange.

40. The illegal Marketing Agreements, in shockingly blatant detail, specify exactly what CTMF desires in the form of patient referrals and services from the Educational Institutions. Quid Pro Quo arrangements for the referral of healthcare business are illegal.

41. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. §2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties are **$5,500 to $11,000** for violations, such as those alleged here, occurring on or after September 29, 1999.  Effective August 1, 2016 penalties have increased to a minimum of $11,181.00 up to $22,363.00 per claim.  *See,* 31 U.S.C. 3729 (a)(1); 28 C.F.R. 85.5 (2018).

42. The AKS makes it clear that violations of the statutes, like those committed by the Defendants, result in false claims under the FCA. *See e.g.*, 42 U.S.C. §1320a-7b(g)("in additional to the penalties provided for in this section…a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31.").

Additionally, violation of the AKS can subject the perpetrator to exclusion from participation in the Government Healthcare Programs and civil monetary penalties of $50,000 per violation and three (3) times the amount of remuneration paid. 42 U.S.C. §1320a-7(b)(7) and 42 U.S.C. §1320a-7a(a)(7).

43. The AKS is designed to ensure that patient care is not properly influenced by inappropriate compensation arrangements within the healthcare industry.

44. Generally, payment of remuneration of any kind violates the AKS if a kickback was provided to induce the recipient to continue doing business with the provider. However, the AKS provide certain safe harbors to exclude specified conduct from their coverage, as long as the involved parties have strictly complied with all the conditions of the safe harbors.

45. The Marketing Agreements between the Defendants and the Educational Institutions to which Defendants offered and paid remuneration are not protected by any such safe harbors, since the arrangements were not at fair-market value (in fact were below fair market value) and were solely designed to improperly induce referrals. They involve the promotion of a business arrangement or other activity that violates both state and federal law(s); and the arrangement is not commercially reasonable, all for services, facilities, goods and items for payments which may be received by CTMF in whole or in part under Medicare, Medicaid, other federal and state healthcare programs, as well as commercial payors.

**B. The Governmental Healthcare Programs**

46. Many of the Educational Institution's employees, students and related family members are Medicaid and/or Medicare eligible qualified patients. Such employees, students and family members would be directed (referred) by CTMF placed athletic trainers, graduate assistant athletic trainers, PRN athletic trainers, Trinity Clinic Physicians and other CTMF employees (including CTMF senior executives in the instance of Tyler Independent School District) to refer such employees, students and family members to CTMF related healthcare facilities for healthcare services, treatments, items, facilities, surgery and rehabilitation treatments. The CTMF related entities would then submit claims to Governmental Healthcare Programs (as well as commercial payors) for

healthcare services, facilities, items and goods all as a result of the illegal Marketing Agreements, which is the mechanism for supplying kickbacks to the Educational Institutions.

47. Many of the Educational Institution's students are deemed "economically disadvantaged". An "economically disadvantaged" student is defined as on who is eligible for free or reduced-price meals or other public assistance, under the National School Lunch and Child Nutrition Program. Many such students, not surprisingly, are eligible and/or enrolled in the Medicaid Program. In 2017 in Smith County, Texas, 82.4% of the population had health coverage with 42.5% with employer healthcare plans, 14.1% on Medicaid, 11.8% on Medicare, 12.7% on other plans and 1.29% on military or VA plans.

48. Based upon Relator's experience, it would be typical that CTMF – Tyler Hospital and its related physician clinic, Trinity Clinic, generally would receive 10% of its revenue from Medicaid, 60% from Medicare, and the balance with commercial payors, TRICARE and self-pay. CTMF-Tyler Hospital received over $67,000,000 from Medicaid in 2015. This is approximately nine percent (9%) of CTMF-Tyler's total 2015 revenue.

49. ***Medicare***. Medicare is a federal program that provides federally subsidized health insurance primarily for persons who are 65 years or older or disabled. *See*, 42 U.S.C. §§1395 et seq. ("Medicare Program"). Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See*, 42 U.S.C. §§426, 426A. The United States Department of Health and Human Services ("HHS") is responsible for the administration and supervision of Medicare, which is funded with taxpayer revenue. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare Program.

50. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home healthcare. *See*, 42 U.S.C. §§1395c-1395i-4. Part B of the Medicare Program covers payment for physician services and certain outpatient services that Part A does not cover. The services provided by the Defendants are covered by Parts A and B.

51. Medicare does not cover claims for physician services, hospital or outpatient services, where there is an AKS violation involved in the underlying transaction. Claims submitted to Governmental Healthcare Programs where a kickback was offered, paid, solicited, or accepted are false under the FCA.

Providers that seek to bill Medicare must sign a Provider Agreement that states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]… I understand that payment of a claim by Medicare is conditioned upon the claims and the underlying transaction complying with such laws, regulations and program instructions including, but not limited to Federal Anti-Kickback Statute… and on the provider's compliance with all applicable conditions of participation in Medicare. (Medicare Enrollment Application, CMS-855B, §15(A)(3)).

52. Medicare enters into provider agreements with healthcare providers to establish their eligibility to participate in the program. To be eligible for payment under Medicare, healthcare providers must certify that they agree to comply with the AKS, among other federal healthcare laws.

53.  The Medicare provider enrollment agreement, "Certification Statement", that all medical providers sign states: "You MUST sign and date the certification statement below in order to be enrolled in the Medicare program. In doing so, you are attesting to meeting and maintaining the Medicare requirements stated below." Those requirements include:

I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . The Medicare laws, regulations and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

\*\*\*\*\*

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity. CMS Form 855B Section 15(A)(3).

54. In addition, when medical devices are reimbursed under Medicare Part D, Part D sponsors must certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, the AKS. 42 C.F.R. §423.505(h)(1).

55. Defendants have submitted or caused to be submitted false claims to the Medicare program in violation of the FCA, by the illegal kickback scheme.

56. *Medicaid*. Medicaid is a joint federal-state program created in 1965 that provides healthcare benefits for certain groups, primarily the poor and disabled. 42 U.S.C. §1396-1396v. Each state is permitted to design its own medical assistance plan. 42 U.S.C. §1396a. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. §1396d(b). Among the states, the FMAP is at least fifty percent (50%) and is as high as eighty-three percent (83%).

57. All state Medicaid programs reimburse for medical devices and medical services used during covered medical procedures. The vast majority of states award contracts to private

companies to evaluate and process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs. Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter. CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter. The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment. After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). 42 C.F.R. §430.30.

58. Claims arising from illegal kickbacks are not authorized to be paid under state regulatory regimes.

59. Certifications that healthcare providers supply to the states (including the State of Texas) for Medicaid reimbursement include compliance with the AKS, among other federal healthcare laws.

60. A provider who participates in the Medicaid program must sign an agreement with their state that certifies compliance with the federal and state Medicaid requirements, including the AKS. Although there are variations among the states, the agreement typically requires the prospective Medicaid provider to agree they will comply with all federal and state laws and Medicaid regulations in billing the state Medicaid program for services or supplies furnished.

61. Through their kickback schemes, Defendants have submitted or caused to be submitted false claims to the Texas Medicaid program in violation of the FCA and the Texas Patient Solicitation Act, thereby violating federal and state laws relating to fraud and abuse in healthcare, and have further concealed that material fact in submitting claims for payment.

62. **TRICARE**. TRICARE, administered by the Department of Defense ("DOD"), is the United States military's healthcare system, designed to maintain the health of active duty service personnel, provide healthcare during military operations, and offer healthcare to non-active duty beneficiaries, including dependents of active duty personnel and military retirees and their dependents. TRICARE operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian healthcare providers. TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations, and fee-for-service benefits.

63. TRICARE requires healthcare providers to certify compliance with the AKS, among other federal healthcare laws. Upon information and belief, the Defendants have submitted claims to TRICARE pursuant to this kickback scheme.

64. **Veterans Administration Healthcare**. The Department of Veteran Affairs ("VA") maintains a system of medical facilities from which all pharmaceutical supplies, including prescription drugs and pharmaceutical products, are purchased directly or indirectly by the VA and dispensed to beneficiaries. It also supports a mail service prescription program as part of the outpatient drug benefit. The system serves approximately four million veterans. Upon information and belief, the Defendants have submitted claims to VA pursuant to this kickback scheme.

### C. **The Kickback Scheme**

65. As outlined more fully below, the kickback scheme involves the provision of "**free**" or "**no cost**" or well **below fair-market value** athletic trainers, graduate assistant athletic trainers, PRN athletic trainers, Trinity Clinic physicians (at **no cost**), donations (unrestricted cash), **free** apparel and **free** equipment to the Educational Institutions.

Additionally, CTMF tracks referrals of students and employees from the Educational Institutions which are obtaining services from CTMF entities and providers. Trinity Clinic Orthopedic Surgery and Sports Medicine Physicians go to (the ISD's) campuses once a week to evaluate sports injuries (at **no cost** – but pursuant to the Marketing Agreements), CTMF provides **free** athletic screening (physicals for all ISD athletes), the ISD agrees that it will utilize CTMF facilities (clearly the Quid Pro Quo). Only CTMF physicians are allowed in the athletic participants area during athletic events, monthly tracking reports are required to be submitted to CTMF, all in exchange for the Educational Institution's promise to exclusively use CTMF's athletic trainers, graduate assistant athletic trainers, PRN athletic trainers and Trinity Clinic Physicians for medical services. These Physicians are seeking referrals of patients that likely would not occur had it not been for the exclusive athletic trainer agreements.

66. The kickback scheme involving CTMF involves government monies in the State of Texas. The AKS and Texas AKS laws are expansive in scope and both clearly prohibit payments for patient referrals.

### V.      FACTUAL ALLEGATIONS - THE SCHOOL DISTRICT CONTRACTS

67. *Chapel Hill ISD ("CHISD").* CHISD has approximately 3,553 students, 550 employees, and 78.1% of its students are economically disadvantaged.

**CTMF Proposal to CHISD (selected excerpts):**

In the spring of 2019 – CTMF proposed to provide to Chapel Hill Independent School District ("CHISD") an athletic trainer agreement. A summary of relevant provisions follows:

(a)        *"(1) CTMF will provide a Full Time, Dedicated, Master Level, athletic trainer at **no cost** to the school." (Emphasis added). The Proposal notes that:*

*"Annual Value to School:*

- *$50,000-$55,000 Salary*

- *$12,000-$14,000 in Benefits"*

(b)        *"CTMF will provide a 2nd Full Time, Dedicated, Graduate Assistant athletic trainer at **no cost** to the school." (Emphasis added)*

*"Annual Value to School:*

- *$25,000 in Salary/benefits/education"*

(c)        *"CTMF will provide a 3rd PRN Clinic based athletic trainer to Chapel Hill at **no cost** to the school."* (Emphasis added)

68. The ***actual CTMF and CHISD Contract***

Not surprising, CHISD signed an Athletic Trainer Agreement with CTMF on May 13, 2019.

**Summary of *the CTMF CHISD contract (and selected excerpts):***

A.   1.1    *CTMF shall provide (2) Athletic Trainers.*

(a) *the Athletic Trainers shall be available on the District's main campus Monday through Friday of each week during the District year, as mutually agreed between CTMF's Director of Sports Medicine and District's Head Athletic Trainer;*

(b) *at other times, the Athletic Trainers shall be available by phone for other District athletic activities and practices designated by the District Head Athletic Trainer and CTMF's Director of Sports Medicine;*

(c) *the Athletic Trainers shall be available on Saturdays for student athlete consultations and treatment and athletic event coverage;*

(d) *the Athletic Trainers shall document and report injuries to appropriate coaches and physicians in accordance with all applicable privacy laws;*

(e) *the Athletic Trainers shall assist the District in developing and implementing policies and procedures for its athletic department promoting preventative health and a safe athletic environment;*

(f) *the Athletic Trainers shall assist the District's in recruiting qualified student athletic trainers to work under the supervision of the Athletic Trainers and the District coaches;*

B. 1.3 *None of the services provided by the Athletic Trainers shall be billed by the Athletic Trainers or CTMF to any student athlete, his or her family, or any third party payer of health insurance claims.*

C. 1.4 *CTMF shall provide, at **no additional cost**, pre-participation physical exams for students identified by the District for one day during the spring semester, on a date mutually agreeable to both parties.*

D. 1.5 *CTMF Shall:*

(a) *Provide a designated team physician at all home varsity football games and all play-off varsity football games.*

(b) *Provide a one (1) hour weekly athletic training room physician clinic on a mutually agreeable day and time for the evaluation and follow-up of District student athletes, coaches and staff.*

(c) *Schedule physician appointments for District student athletes, coaches and staff within twenty-four (24) hours of injury.*

(d) *Perform standard diagnostic imaging (i.e. X-ray & MRI) within 24 hours of clinical evaluation and will provide results to athletic training staff within 24 hours of obtaining diagnostic imaging. CTMF will provide copies of diagnostic reports once available via fax. All such communication of patient information will be subject to proper authorization from the parents of the students or, in the case of adult students, the students themselves.*

(e) *Provide direct access to physicians (i.e. cell phone or pager number) by District full-time athletic training staff.*

(f) *Provide at* **no additional cost** *a second Part-time Texas Licensed, Clinic Based, Athletic Trainer, at the sole discretion of CTMF, to assist the District employees and assigned Athletic Trainers in covering multiple or large scale sports events sponsored by the District and act as a liaison between the Athletic Trainers and providers and services in order to help facilitate appointments and provide results/orders to the Athletic Trainer from treating providers.*

(g) *Provide up to* **$5,000** *annually for equipment and supplies necessary to operate an athletic training room, and to provide all the services required under this Agreement.*

*(h) Provide up to **$5,000** annually for the purchase of apparel for Staff and Student Athletic Trainers and/or special Athletic Events hosted by the District.*

*(i) Facilitate scheduling of orthopedic, sports medicine, physical therapy and general medical services, as appropriate, for injured and/or ill District student athletes, coaches, and athletic staff.*

*(j) Provide Saturday Sports Injury Clinics on mutually agreeable dates and times during the fall football season at a designated CTMF facility.*

*(k) Provide Annual CPR/ AED Training to District students, coaches, sponsors, faculty, and staff at mutually agreeable times and locations.*

*E   2.4    The District will include advertisements for CTMF in its printed program materials at each game and signage in the District athletic training room, per a separate marketing agreement (the school district indicates no separate marketing agreement exists) approved by both parties. The District will not allow other healthcare providers to advertise their services at District's facilities or events or in District's printed program materials for any event, unless District obtains CTMF's prior written consent.*

*F   2.5    The District shall inform CTMF of the District's selected supplemental athletic insurance companies and cooperate with CTMF in efforts to make CTMF a participating healthcare provider under such insurance companies' policies.*

For all of the services the District receives, the District **pays nothing**. This Agreement is for a term of five (5) years.

69. ***Lindale ISD ("LISD")*** (4,073 students, 281 teachers, 42.6% of students economically disadvantaged)

70. **CTMF RFP to LISD**. The LISD RFP is virtually the same as CHISD RFP, as noted above.

71. **CTMF - LISD Contract**. The LISD Contract also is virtually the same as CHISD. It was entered into on May 13, 2019. It also is a five (5) year agreement. (Total **free** value of personnel, and services at well over $200,000 per year)

72. **Email Correspondence**. In an email between CTMF and LISD dated May 25, 2019, it is noteworthy that CTMF purchases so much ISD apparel for the Educational Institutions that CTMF gets a volume discount.

73. *Jacksonville ISD ("JISD")* JISD has approximately 4,987 students, 340 teachers, and 76.4% of the students are economically disadvantaged.

74. **CMTF Proposal to JISD (selected excerpts):**

   In late 2018 or early 2019, CTMF proposed to JISD a similar athletic trainer agreement as what it presented to CHISD. The CTMF proposal noted that:

   *(1) "Christus Trinity Mother Frances Health System will: (1) Provide [JISD] a dedicated, masters level, athletic trainer licensed by the State of Texas ("Athletic Trainer") at **no cost** to JISD." (Emphasis added) (Again, the value set by CTMF is $69,000 per year.)*

   *(2) "Provide JISD with a dedicated, graduate assistant or fellowship athletic trainer licensed by the State of Texas "Athletic Trainer" as long as there are sufficient qualified candidates to attract at no future cost to JISD". (Emphasis added) (The value set by CTMF is $25,000 per year.)*

   *(3) "Provide JISD a PRN, Masters Level, Athletic Trainer licensed by the State of Texas "Athletic Trainer" to assist staffing when there are scheduling conflicts due to multiple simultaneous events or personal leaves at **no cost** to JISD". (Emphasis added)*

   *(4) "A dedicated Team Physician, Dr. Steven Johnson, MD".*

(5) "$25,000 per year for an exclusive Marketing contract across the JISD athletic facilities to include the football stadium, and all other athletic venues".

(6) "Support for individual sporting events hosted by JISD as mutually agreed to by the JISD athletic director and the CTMF director of Sports Medicine. These would include but not be limited to providing tournament participant shirts, CTMF tents, the Mobile Athletic Training Room, etc…"

(7) "Christus Trinity Mother Frances shall also provide, at **no cost**, pre-participation physical exams for high school student athletes identified by JISD for one day during the spring semester, on a date mutually agreeable to both parties.

Christus Trinity Mother Frances will also:

- Schedule appointments with Christus Trinity Clinic physicians/specialists for student athletes within 24 hours of injury if the parent chooses Christus to provide the medical care recommended.

- Perform standard diagnostic imaging (i.e. X-ray & MRI) within 24 hours of clinical evaluation and will provide results to athletic training staff within 24 hours of obtaining diagnostic imaging if the parent/guardian chooses Christus to provide the medical care recommended.

- Provide direct access to Christus Trinity Clinic physicians (i.e. cell phone or pager number) by full-time athletic training staff.

> - *Facilitate orthopedic, sports medicine, physical therapy and general medical services for injured and/or ill school student athletes, coaches, and athletic staff who choose Christus as their medical provider."*

JISD apparently did not agree to use CTMF in 2019, but the Federal AKS clearly applies in the instances of an "offer" of a kickback. 42 U.S.C. §1320a-7b(b)(2).

75. Previously CTMF had an Agreement with JISD entered into on June 8, 2015 – in this Agreement –

"The District is to pay $9,000 for such services." (CTMF provides a Trainer)

76. Clearly the value as noted in the CHISD proposal is well in excess of $9,000 per year. Just the athletic trainer alone is by CTMF's own proposal worth at least $69,000.

77. ***Tyler ISD ("TISD")*** TISD has approximately 18,000 students, 2,650 employees, and 73.2% of its students are economically disadvantaged.

78. Tyler ISD is the largest ISD in East Texas. CTMF has multiple kickback arrangements with TISD.

79. CTMF has several agreements with TISD. In the exclusive Sponsorship Agreement (entered into in 2004) – CTMF paid $1,920,000 (over an eleven year period from 2004-1015) to be a title sponsor of a stadium.

80. From 2016-2026, CTMF has a scheduled payout to TISD of $1,250,000. ($125,000/ year)

- Additional **cash** Payment of $250,000 to TISD Booster Club ($25,000 **cash**/each year)

- In-kind service $5,000 per year.

81. Additionally, a special joint operating council was created that includes the TISD Athletic Director, TISD Athletic Trainer(s), TISD Public Relations Director, TMF Sports

Medicine, TMF Marketing Director, and TMF Vice President. Clearly the intent of the arrangement is to foster continued referrals from the highest levels of CTMF – pursuant to these illegal Marketing Agreements.

82. <u>Trainer Agreement</u> – CTMF entered into an Agreement to provide athletic trainers to TISD in July 2015 (but had similar prior agreements from 2004).

83. CTMF is providing four (4) athletic trainers (Estimated value per the CISD Agreement and JISD 2019 proposal (noted above) - $69,000 (for each athletic trainer) x 4 = $276,000 per year). CTMF is only charging in total $14,500 per year (2014-2015). On its face, the kickback is over $240,000 per year.

84. For years 2015-2016, TISD pays CTMF $29,000 a year.

85. For years 2016-thereafter, CTMF is paid $36,000 per year by TISD.

86. Utilizing the value that CTMF made to CHISD and JISD in the 2019 proposals, the value of four (4) athletic trainers would be $69,000 (for each athletic trainer) x 4 = $276,000 (<u>NOT $36,000</u>). This is a per se Annual Kickback of at least $240,000 per year.

87. Not only is CTMF paying for referrals, they are tracking them. In the First Amendment to the Athletic Trainer Agreement (2015) in Section 2F; "The TISD Head Athletic Trainer or other applicable personnel shall submit to the TMF Leader of Sports Medicine Services a monthly report of all athletic injuries and all athlete provider <u>referrals</u> for the previous month. Such report shall be submitted not later than the tenth (10th) day of the month following the month of activity reported." (Emphasis added).

88. The CTMF Agreement to TISD to provide Team Physicians was entered into on July 1, 2015, but a prior one had been in place since 2004.

89. ***First Amendment to TISD Team Physician Agreement***. In the First Amendment to the TISD Team Physicians contract – The TISD health athletic trainer shall submit to CTMF

a "monthly report of all athletic injuries and all <u>athlete provider referrals</u> for the prior month". (Emphasis added)

90. ***TISD Trainer Agreement***. The CTMF Agreement with TISD to provide athletic trainers (for the years 2004-2015) states:

- *The Trainer will work Monday-Friday and Saturdays.*

- *The Trainer is available by pager.*

- *TISD pays annual fee of $14,500 (year 1-11) and decreasing to $7,250 year 12.*

91. Clearly, even in 2004 an athletic trainer was worth more than $14,500.

In 2019 the value placed upon an athletic trainer by CTMF was $69,000, but as late as 2015; the actual payment made by TISD to CTMF was only $7,250.00 per the contract, a below market value rate of $61,000 per trainer.

92. The exact language of the TISD Athletic Trainer Contract further notes the purpose of the illegal Marketing Agreements:

*"B. TISD shall utilize, as appropriate, TMFHS facilities to the extent medically necessary and subject to appropriate parental consent for the medical treatment of minors, continuity of care requirements, and managed care requirements. (Section 2B)."*

93. In the TISD Athletic Trainer Contract there is specific language related to referrals:

*"F. The school athletic trainer will submit a monthly report to the Leader of Sports Medicine Services of athletes seen by TMFHS providers (i.e. ER, surgery, Therapy, etc.)."*

94. ***Team Physician Contract with TISD***. The CTMF Agreement to provide Team Physicians to TISD (entered in 2004, Effective 2007-2016) states:

*"1. Trinity Mother Frances Health System or its designated corporate representative shall provide team physicians to TISD. The physician shall be a physician of Trinity Clinic, Department of Orthopedic Surgery and Sports Medicine.*

*\*\**

*3. The Trinity Clinic physicians shall be available and present for all varsity home and all playoff football contests of John Tyler and Robert E. Lee High Schools.*

*4. The Trinity Clinic Orthopaedic (sic) Surgery and Sports Medicine physicians shall provide a once a week on-site visit to both John Tyler and Robert E. Lee High School's training rooms to evaluate and treat interscholastic athletic injuries. Both Trinity Clinic and the head athletic trainer at each school will mutually agree upon the day of the week and the time.*

*5. TMFHS will provide Saturday Morning Sports Injury Clinic during football season (Mid-August-Mid-November) as has been customary in Tyler.*

*6. The TISD schools shall receive same day, next day work-in with a Trinity Clinic Orthopaedic (sic) Surgery and Sports Medicine physician, for all interscholastic athletic injuries.*

*7. TMFHS will provide pre-participation athletic screenings for athletes involved in TISD interscholastic athletics.*

*8. The Trinity Clinic Orthopaedic (sic) Surgery and Sports Medicine physicians will be available by pager."*

*\*\**

*Additionally in Section 2 of the Team Physicians Agreement:*

*"A. TISD shall utilize, as appropriate, Trinity Clinic Orthopaedic (sic) Surgery and Sports Medicine physicians, and Trinity Mother Frances Health System facilities*

Page 31 of 54

> *to the extent medically necessary and subject to appropriate parental consent for*
> *medical treatment of minors, continuity of care requirements, and managed care*
> *requirements for all interscholastic athletic injuries.*
>
> B. *TISD shall assure that __only__ TMFHS physicians will be permitted in the*
> *participant's area at the TISD interscholastic athletic events during the term of*
> *this Agreement.*
>
> C. *The school head trainer will submit a monthly report to the Leader of Sports*
> *Medicine Services of athletes seen by Trinity Clinic Orthopaedic (sic) Surgery and*
> *Sports Medicine physicians, and Trinity Mother Frances Health System providers*
> *(i.e. ER, surgery, Therapy, etc.). D. The school head athletic trainer will submit a*
> *monthly report to the Leader of Sports Medicine services of athletes seen by*
> *Trinity Clinic Orthopaedic (sic) Surgery and Sports Medicine physicians, and*
> *Trinity Mother Frances Health System Providers (i.e. ER, surgery, Therapy, etc.)."*

95. The services being provided by CTMF pursuant to the TISD Team Physician Agreement
are at **NO COST**. (*Nowhere within the contract is there a consideration or payment provision*.)

96. Federal guidance from the DHS, office of Inspector General notes that, when scrutinizing
joint ventures under the AKS, hospitals should examine a number of factors:

• The existence of one or more of the following indicators suggests that there might
be an improper nexus between the selection or retention of participants and the value
or volume of their referrals;

• Participants are actively encouraged or required to make referrals to the joint
venture;

- Participants are encouraged or required to divest their ownership interest if they fail to sustain an ''acceptable'' level of referrals;

- The venture (or its participants) <u>tracks its sources of referrals</u> and distributes this information to the participants.   DHHS, *OIG Supplemental Compliance Guidance for Hospitals*, FR, Vol. 70, No. 19, P. 4858  (Monday, Jan. 31, 2005).

- At a minimum, to reduce (but not necessarily eliminate) the risk of abuse, hospitals should consider; (iv) refraining from tracking in any manner the volume of referrals attributable to particular referrals sources; *Id*.

97. To make it clear that CTMF was not acting by some rogue employee, the 2015 TISD Team Physician First Amendment was executed by Ray Thompson SVP/System Chief Operating Officer.

98. So not only was CTMF paying kickbacks, CTMF was clearly tracking all referrals that it was getting from TISD, and the executive officers clearly were deeply instrumental in the creation, development and operations in the scheme.

99. ***Whitehouse ISD ("WISD")*** actual contract WISD has approximately 4,725 students, 313 teachers, and 41.29% of its students are economically disadvantaged.

100. WISD signed a very similar Athletic Trainer Agreement to CHISD, which was entered into on August 3, 2015.

101. **Summary of WISD Contract:**

1) *1.1     CTMF shall provide (2) Athletic Trainers.*

   *1.2     (a) the Athletic Trainers shall be available on the District's main campus Monday through Friday of each week during the District year, as mutually agreed between CTMF's Director of Sports Medicine and District's Head Athletic Trainer;*

(b) at other times, the Athletic Trainers shall be available by phone for other District athletic activities and practices designated by the District Head Athletic Trainer and CTMF's Director of Sports Medicine;

(c) the Athletic Trainers shall be available on Saturdays for student athlete consultations and treatment and athletic event coverage;

(d) the Athletic Trainers shall document and report injuries to appropriate coaches and physicians in accordance with all applicable privacy laws;

(e) the Athletic Trainers shall assist the District in developing and implementing policies and procedures for its athletic department promoting preventative health and a safe athletic environment;

(f) the Athletic Trainers shall assist the District's in recruiting qualified student athletic trainers to work under the supervision of the Athletic Trainers and the District coaches;

2) 1.3   None of the services provided by the Athletic Trainers shall be billed by the Athletic Trainers or CTMF to any student athlete, his or her family, or any third party payer of health insurance claims.

3) 1.4   CTMF shall make reasonable efforts to arrange for its physical therapists, occupational therapists, exercise physiologists and physicians specializing in sports medicine to consult with the Athletic Trainers as reasonably needed for the Athletic Trainers to provide the services set forth.

4) 1.5   CTMF shall provide, at **no additional cost**, pre-participation physical exams for students identified by the District for one day during the spring semester, on a date mutually agreeable to both parties.

5) *1.6*    *CTMF Shall:*

(a) *Provide a designated team physician at all home varsity football games and all play-off varsity football games.*

(b) *Provide a one (1) hour weekly athletic training room physician clinic on a mutually agreeable day and time for the evaluation and follow-up of District student athletes, coaches and staff.*

(c) *Schedule physician appointments for District student athletes, coaches and staff within thirty-six (36) hours of injury.*

(d) *Perform standard diagnostic imaging (i.e. X-ray & MRI) within 24 hours of clinical evaluation and will provide results to athletic training staff within 24 hours of obtaining diagnostic imaging. CTMF will provide copies of diagnostic reports once available via fax. All such communication of patient information will be subject to proper authorization from the parents of the students or, in the case of adult students, the students themselves.*

(e) *(d) (sic) Provide direct access to physicians (i.e. cell phone or pager number) by District full-time athletic training staff.*

(f) *Facilitate orthopedic, sports medicine, physical therapy and general medical services, for injured and/or ill District student athletes, coaches, and athletic staff.*

(g) *Provide Saturday Sports Injury Clinics on mutually agreeable dates and times during the Fall football season at a designated CTMF facility.*

(h) *Provide Annual CPR/ AED Training to District students, coaches, sponsors, faculty, and staff at mutually agreeable times and locations.*

*6) 2.1   The District shall pay to Trinity Mother Frances a fee of Eleven Thousand Dollars ($11 ,000.00) payable in two (2) equal installments of Five Thousand Five Hundred Dollars ($5,500.00) each, payable to "Mother Frances Hospital-Tyler" in September and January of each year during the term of this Agreement.*

*7) 2.4   The District will include advertisements for CTMF in its printed program materials at each game and signage in the District athletic training room, per a separate marketing agreement approved by both parties. The District will not allow other healthcare providers to advertise their services at District's facilities or events or in District's printed program materials for any event, unless District obtains CTMF's prior written consent.*

*8) 2.5   The District shall inform CTMF of the District's selected supplemental athletic insurance companies and cooperate with CTMF in efforts to make CTMF a participating healthcare provider under such insurance companies' policies.*

102. The District receives a very nominal amount, $11,000 per year, for all the services it receives. Just the two (2) Athletic Trainers alone are worth (per CTMF proposal to CHISD) $69,000 x 2 = $138,000 value less payment of $11,000 = $127,000 annually below market value of just the athletic trainers alone. This Agreement is for a term of five (5) years.

103. **Overton ISD ("OISD").** OISD has approximately 524 students, 50 teachers, and 63.9% of its students are economically disadvantaged.

104. The Christus Foundation has provided a $45,000 "grant" to OISD for the athletic trainer's salary. The final payment of such grant was made in 2018. This grant is specifically related to athletic trainers.

105. *Other Schools*

Upon information and belief, CTMF has athletic trainer contracts and sponsorship similar to CHISD, with over 20 East Texas school districts, these include:

106. **Grace Community School** (1,000 students, 135 teachers) (FYI, the Senior Vice President of Group Operations for Christus Health and CEO of Christus Health Northeast Texas, Chris Glenney is also on the School Board at Grace);

107. **All Saints Episcopal School** (650 students, 135 teachers);

108. **Bishop T.K. Gorman Catholic School** (365 students, 42 teachers);

109. **Lindale ISD** (4,073 students, 276 teachers, and 42.6% of its students are economically disadvantaged);

110. **Hallsville ISD** (5,070 students, 363 teachers, and 40.8% of its students are economically disadvantaged); upon information and belief, CTMF has entered into similar Athletic Trainer Agreements with Hallsville ISD as described above. CTMF also provided a $10,000 **cash** payment to the Athletic Director to use as needed, wherein the Athletic Director placed the funds in the football budget.

111. The promised kickbacks and other promises made in the CTMF RFP's were ultimately codified into the various contracts between CTMF and the various Educational Institutions.

112. These promised kickbacks for the referral of patients for Governmental Healthcare Program services were paid to win, and keep, exclusive referral arrangements and contracts, which are unlawful on their face. CTMF not only promised to provide a host of "**free**" and "**no cost**" items and services, they also provided **cash**, along with other kickbacks and improper tracking of referrals to keep the exclusive referral contracts.

113. These illegal kickback agreements improperly subverted the competitive bidding process precluding other more qualified providers from gaining contracts thus depriving the customers, patients and family members of the best providers and best service possible.

114. The Office of Inspector General ("OIG") for the Department of Health and Human Services voiced similar concerns about kickbacks in its November 27, 2013, Advisory Opinion No. 13-18.

115. The OIG noted that provisions of various healthcare items at nominal or no cost to the [city] in exchange to be the [city's] exclusive supplier of EMS services, including those payable by Governmental Healthcare Programs, would fit squarely within the language of the Anti-Kickback Statute. *Id.*

116. The arrangements that CTMF has proposed, and which CTMF has entered into, violate both Federal and State Anti-Kickback Statutes. They result in the Defendants submitting, or causing to be submitted, false claims and fraudulent bills to Governmental Healthcare Programs. Based upon the Relator's estimates, the practices resulted in millions of improper tax-payer funded payments by Government Healthcare Programs to the Defendants.

117. Ultimately, CTMF ensured the success of the long established Quid Pro Quo arrangements that began as far back as 2004 with TISD, and continue now, even after TMF System was acquired by Christus Health in 2016. These Quid Pro Quo arrangements were fostered and ultimately very successful because the kickbacks to the Educational Institutions had the intended effect of steerage and referral of patients. CTMF direct payments of kickbacks has "caused or assisted" in the presentation of false

claims and statements to the United States and the State of Texas, Governmental Healthcare Programs.

118. CTMF's submissions of certifications and claims which were tainted by illegal kickbacks were a natural and foreseeable consequence of CTMF's arranging of the kickback scheme.

119. The submission of CTMF cost reports were tainted by bribes and kickbacks, along with the accompanying certifications, and were a natural and intended consequence of CTMF's actions.

120. The Defendants entities are intertwined and interrelated. Each of the Defendants supports the other, but Christus Health is the ultimate parent. Christus Health presumably did due diligence in 2016 and knew of the arrangement with TISD. Since 2016, the Christus Mother Frances System and related entities have begun an aggressive and calculated campaign and effort to foster the illegal scheme. Ray Thompson was the signatory on the original TISD agreements in 2004 and, along with Lindsey Bradley were the two most senior executives at Trinity Mother Frances Health System prior to 2016.  In 2016 after the Christus acquisition, Ray Thompson and Lindsey Bradley continued with Christus Health where they were given top level roles at Christus Health, and today Lindsey Bradley sits on the Christus Board of Directors.

121. The Relator has set forth the following key elements of an FCA claim; all of which are in detail and specifically outline the scheme to offer kickbacks in order to induce referrals for payment by Governmental Healthcare Programs and payors.

    a) He has provided to the United States the "who" – the CTMF Defendants;

    b) He has provided to the United States the "what" – illegal exclusive agreements with Educational Institutions;

c)  He has provided to the United States the "when" – as set forth in the various agreements with the Educational Institutions;

d)  He has provided to the United States the "where" – all across East Texas, but primarily Tyler, Texas; and

e)  Finally, he has provided to the United States the "how" – the scheme is set forth in the illegal agreements with the Educational Institutions to seek and obtain, as well as maintain long term access to, patient populations through illegal means in order to bill and collect for healthcare services which are ultimately paid for by the citizens of the United States through Medicaid, Medicare and other governmental, state and commercial payors.

## COUNT I

**Violations of the False Claims Act: Presenting False Claims for Payment (31 U.S.C. §3729(a)(1)(2008), and, as amended, 31 U.S.C. §3729(a)(1)(A))**

122.  Relator incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

123. The Relator seeks relief against Defendants under §3729(a)(1) of the False Claims Act, 31 U.S.C. §3729(a)(1)(2008), and, as amended, 31 U.S.C. §3729(a)(1)(A), 31 U.S.C. 3729 (a)(1)(B), 31 U.S.C. 3729 (a)(1)(c) for violations after June 1, 2008.

124. CTMF's illegal Marketing Agreements were entered into in order to induce the local Educational Institutions, their employees, students and family members to utilize (obtain referrals and patient steerage) CTMF facilities, physicians and other healthcare providers, as a result of kickbacks to the Educational Institutions (a violation of the federal Anti-Kickback Statute), 42 U.S.C. §1320a-7b(b)(2), and resulted in false and fraudulent claims for payment for CTMF's services and healthcare products and procedures, were made to Governmental Healthcare Programs. Accordingly, CTMF and

the other Defendants knowingly caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A)(2008), and, as amended, 31 U.S.C. §3729(a)(1)(A), 31 U.S.C. 3729(a)(1)(B), 31 U.S.C. 3729(a)(1)(c) for violations after June 1, 2008.

125. By reason of the false or fraudulent claims, the United States has sustained damages in a substantial amount, to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## <u>COUNT II</u>

**Violations of the False Claims Act: Presenting False Claims for Payment (31 U.S.C. §3729(a)(2)(2008), and, as amended, 31 U.S.C. §3729(a)(1)(B))**

126. The Relator incorporates by reference paragraphs the preceding paragraphs as if fully set forth herein.

127. The Relator seeks relief against Defendants under the False Claims Act, 31 U.S.C. §3729(a)(2)(2008), and, as amended, 31 U.S.C. §3729(a)(1)(B).

128. On or after June 7, 2008, Defendants violated the FCA in the following respects:

   a) Knowingly making, using or causing to be made or used, false records or statements material to false claims to Government Healthcare Programs, in violation of §3729(a)(1)(B) of the FCA.

129. As a result of CTMF's kickbacks to induce local Educational Institutions by way of steerage and referrals through CTMF's athletic trainers, graduate assistant athletic trainers, PRN athletic trainers, physicians and healthcare providers who referred students, employees and family members of the Educational Institutions to CTMF facilities, and CTMF healthcare providers to provide healthcare services, all in violation of the Federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b)(2), Defendants knowingly caused physicians, and related healthcare entities and healthcare providers to make false

records or statements that were material to false or fraudulent claims for payment submitted to Governmental Healthcare Programs. The false records or statements were the physician's and healthcare provider's false certifications and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent and false reporting, including but not limited to the AKS, 42 U.S.C. §1320a-7b.

130. CTMF violated AKS 42 U.S.C. §§3729(a)(1)(A), and 3729(a)(1)(B), and knowingly caused false claims to be made, used and presented to the United States by their violations of federal and state laws, including but not limited to 42 U.S.C. §1320a-7b, by inducing over twenty (20) Educational Institutions to contract with CTMF for exclusive Athletic Trainer Agreements through the use of kickbacks, as described herein.

131. By reason of these false records or statements, the United States has sustained damages in a substantial amount, to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

### COUNT III

### "Conspiracy" (31 U.S.C. §3729(a)(1)(c))

132. Relator incorporates by reference the preceding paragraphs as if fully set forth in this paragraph.

133. Relator seeks relief against Defendants under §3729(a)(3) of the FCA, 31 U.S.C. §3729(a)(3)(1986), and, as amended, 31 U.S.C. §3729(a)(1)(C).

134. As set forth above, CTMF conspired with a host of Educational Institutions to offer and pay kickbacks in exchange for exclusive Marketing Agreements, which steered thousands of prospective patients to CTMF affiliated entities and healthcare providers in violation of the AKS, 42 U.S.C. §1320a-7b(b)(2), thereby causing the physicians and healthcare providers to submit false and fraudulent claims to Medicare and Medicaid

seeking reimbursement for such healthcare services in connection with the kickback scheme.

135. Accordingly, CTMF conspired to defraud the United States by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. §3729(a)(3), and conspired to commit violations of 31 U.S.C. §§3729(a)(1)(A) and 3729(a)(1)(B), in violation of 31 U.S.C. §3729(a)(1)(C).

136. By reason of the false or fraudulent claims CTMF and the Educational Institutions conspired to get paid or by reasons of their conspiracy to violate 31 U.S.C. §3729(a)(1)(A), §3729(a)(1)(B) and §3729(a)(1)(C), the government has been damaged and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT IV

### False Claims due to Kickbacks, MMPPA Violations

137. Relator, acting in the name of and on behalf of the United States and himself, realleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

138. The Medicare and Medicaid Patient Protection Act ("MMPPA") of 1987, 42 U.S.C. §1320a-7b, provides criminal penalties of up to $25,000 or five (5) years in jail or both for violations of the Anti-Kickback Statute. 42 U.S.C. §1320a-7b(b).

139. Each claim by Defendants for reimbursement for healthcare services represents a false claim for payment because each claim carried with it a false certification by Defendants that the service they provided complied with the AKS.

140. Defendants have violated the AKS by implementing programs that provided a direct and substantial financial incentive to induce local Educational Institutions to use various CTMF related entities, and service providers.

141. Unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, and in reliance on the truthfulness and accuracy of Defendants' certifications, the United States, and the State of Texas paid and continues to pay on claims that would not be paid but for Defendants' wrongful actions and omissions.

142. Defendants' actions constitute false claims and statements under 31 U.S.C. §3729 *et seq.*, pursuant to 42 U.S.C. §1320a-7b(g).

## COUNT V

### Unjust Enrichment and Unfair Competition

143. Relator, acting in the name of and on behalf of the United States and himself, realleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

144. The United States paid claims submitted to Governmental Healthcare Programs for reimbursement for Defendants based on false statements submitted to Governmental Healthcare Programs as a result of CTMF's violations of applicable federal and state laws and regulations, including the AKS, 42 U.S.C. §1320a-7b. The circumstances of CTMF's receipt of payments based on the kickbacks are such that, in equity and good conscience, Defendants should not retain those payments, the amount of which is to be determined at trial.

145. ***Unfair Competition***. By paying illegal kickbacks to the Educational Institutions, CTMF was able to obtain over twenty (20) agreements with local Educational Institutions utilizing kickbacks, which allowed CTMF an unfair advantage to obtain such contracts.

Other qualified, and arguably more qualified, healthcare providers were precluded from obtaining these contracts due to the payment of kickbacks to the Educational Institutions. Other qualified healthcare providers are unable to compete in the marketplace when CTMF provides bribes and kickbacks by offering and supplying **free** athletic trainers, **free** graduate assistant athletic trainers, **free** PRN athletic trainers, **free** Trinity Clinic physicians, **free** equipment, **free** apparel and **_cash_** donations. Other providers who were trying to follow applicable law and sought arms-length fair market value relationships (i.e. without kickbacks), were precluded from thousands of potential patients who likely could, or would, have been patients had the illegal Marketing Agreements not been entered into and subsequently, effectively barred such competitors of CTMF from even having access to such patient populations due to the exclusive nature of these Marketing Agreements.

## COUNT VI

### False Certification Liability

146. CTMF is liable for multiple false claims submitted to the federal government under the doctrine of false certification liability.  When CTMF submits a claim to the federal government, it expressly or impliedly[2] certifies that it has complied with all applicable federal statutes.

---

[2] In June 2016, the Supreme Court issued its long-anticipated decision in Universal Health Services, Inc. v. United States ex rel. Escobar.  Universal Health Services, Inc. v. U.S., 136 S. Ct. 1989, 195 L. Ed. 2d 348, 41 I.E.R. Cas. (BNA) 709 (2016). The Court in Escobar held that the implied certification theory is a viable basis for FCA liability "when a defendant submitting a claim makes specific representations about the goods and services provided, but fails to disclose noncompliance with material statutory, regulatory, or contractual requirements that make those representations misleading with respect to those goods or services." Id. at 1993–94 (emphasis added). The Court in Escobar also held that "FCA liability for failing to disclose violations of legal requirements does not turn upon whether those requirements were expressly designated as conditions of payment".  Id. at 1994.

147. Moreover, the government would not have paid the claim had it known that CTMF was in violation of one or more statutes.  If a healthcare entity submits a claim for payment to the federal government (as CTMF did), the government requires certification prior to payment of benefits (as it did), and the entity certifies it is in compliance with all applicable federal statutes (as CTMF did), but the entity has violated one or more federal statutes (as CTMF had), the false certification theory of liability makes that submitted claim for reimbursement a false claim under the FCA.

148. Examples of improper actions by CTMF that generate false certification claims include: provision of "**free**" or "**no cost**" or **below fair-market value** athletic trainers, graduate assistant athletic trainers, PRN athletic trainers, Trinity Clinic physicians (at **no cost**), donations (unrestricted **cash**), **free** apparel and **free** equipment. Additionally, CTMF tracks referrals of students and employees from the Educational Institutions which are obtaining services from CTMF entities and providers. In some instances, the trainers are even being evaluated based upon the referrals they make to CTMF.

149. Trinity Clinic Orthopedic Surgery and Sports Medicine Physicians are on many of the Educational Institution's  campuses once a week to evaluate sports injuries (at **no cost** – but pursuant to the Marketing Agreements), CTMF provides **free** athletic screening (physicals for TISD athletes), TISD agrees that it will utilize CTMF facilities (clearly the Quid Pro Quo), only CTMF physicians are allowed in the athletic participants area during athletic events, monthly tracking reports are required to be submitted to CTMF, all in exchange for the Educational Institution's promise to exclusively use CTMF's athletic trainers, graduate assistant athletic trainers, PRN athletic trainers and Trinity Clinic Physicians for medical services, facilities, goods, items and physicians.

150. These are all false claims under the FCA due to the fact that the fraudulent claims were submitted to the federal government under a false premise–namely that the healthcare entity was in compliance with all applicable federal statutes, when it was not.  The doctrine of false certification liability brings these fraudulent CTMF claims within the jurisdiction of the FCA.

151. CTMF is liable under a theory of false certification because CTMF submitted various documents to the federal government, including but not limited to HCFA–1500, Form 2552-96–Medicare cost reports, and other records and documents stating it was in compliance with all applicable statutes.

### <u>COUNT VII</u>

**Texas Medicaid Fraud Prevention Act ("TMFPA")**
**TEX. HUM. RES. CODE ANN 36.001-.132**

152. Relator, acting in the name of and on behalf of the United States and himself, realleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

153. This is a qui tam action brought by Plaintiff-Relator on behalf of the State of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code §36.001 et seq.

154. V.T.C.A. Hum. Res. Code §36.002 provides liability for an person who –

(1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:

(a) on an application for a contract, benefit, or payment under the Medicaid program; or

(b) that is intended to be used to determine its eligibility for a benefit or payment under the Medicaid program.

(2) knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

(a) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

(3) knowingly or intentionally charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient if the cost of the service provided to the Medicaid recipient is paid for, in whole or in part, under the Medicaid program.

155. Defendant CTMF violated V.T.C.A. Hum. Res. Code §36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by its deliberate and systematic violation of federal and state laws, including the FCA, Federal Anti-Kickback Act and §36.002.

156. The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendant CTMF's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

157. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with

Defendant's conduct. Compliance with applicable Texas statutes and regulations was an express condition of payment of claims submitted to the State of Texas.

158. Had the State of Texas known that the Defendants were violating the federal and state laws cited herein, and/or that the claims submitted in connection with Defendants CTMF conduct failed to meet the reimbursement criteria of the government-funded healthcare programs, or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

159. As a result of Defendants' violations of V.T.C.A. Hum. Res. Code §36.002, the State of Texas has been damaged.

160. The Defendants did not, within thirty (30) days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and has not otherwise furnished information to the State regarding the claims for reimbursement at issue.

161. Plaintiff demands judgment against the Defendants as follows:

   a.    That by reason of the aforementioned violations of the Texas Medicaid Fraud Prevention Statute that this Court enter judgment in Plaintiff's favor and against Defendants in an amount equal to two times the amount of damages that the State of Texas has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000 and not more than $15,000 for each violation of TEX. HUM. RES. CODE ANN. §36.002(8) that results in injury to an elderly person, a disabled person, or a person younger than 18 years of age, or not less than $1,000 and not more than $10,000 for each violation of the TEX.

HUM. RES. CODEE ANN. §36.002(8) that does not result in an injury to a person;

b.      That Relator, as Qui Tam Plaintiff, is awarded the maximum amount allowed pursuant TEX. HUM. RES. CODE ANN. §36.110 and/or any other applicable provision of law;

c.      That Relator be awarded all costs and expenses of this action, including attorney's fees and court costs incurred in the prosecution of this suit; and

d.      That Plaintiff and Relator have such other and further relief that this Court deems just and proper.

## COUNT VIII

### Texas Patient Solicitation Act Tex. Occ. Code Chapter 102.001 et seq.

162. Relator, acting in the name of and on behalf of the United States and himself, realleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

163. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code §36.101 on behalf of himself and the State of Texas.

164. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program, as well as violations of the Texas AKS, as to private commercial payors.

165. The Texas Patient Solicitation Act ("Texas AKS") is very similar to the Federal Anti-Kickback Statute. The Texas AKS states:

"A person commits an offense if the <u>person knowingly offers to pay</u> or agrees to accept, <u>directly or indirectly</u>, overtly or covertly any <u>remuneration in cash or in kind to</u> or from <u>another for securing or soliciting a patient</u> or patronage <u>for</u> or from <u>a person licensed, certified, or registered by a state health care regulatory agency</u>."

166. CTMF and Trinity Clinic Physicians, ancillary providers, athletic trainers, hospitals, and other CTMF facilities are all licensed by a host of Texas healthcare agencies. The Texas AKS applies to all payors, not just Governmental Healthcare Programs such as Medicaid or Medicare. As such, claims that have been submitted to Blue Cross Blue Shield, United Healthcare, Cigna and Aetna as well as employer self-funded claims are all subject to the Texas AKS.

## **PRAYER**

167. Relator, on behalf of himself and the United States, requests that after sixty (60) days or upon order by the Court, the Defendants be cited to appear and answer.  Relator also requests that upon final trial or hearing, judgment be awarded to Relator and the United States and imposed upon each of the Defendants jointly and severally for actual damages, and triple damages pursuant to the Federal False Claims Act, 31 U.S.C. §3729(a), civil penalties for each false claim submitted where appropriate, reasonable attorneys' fees, expenses, and costs.

168. If the federal government intervenes, Relator requests that he be awarded an amount for originating this action and cooperating with the federal government of 25% of the judgment or settlement.  If the federal government declines to intervene, Relator requests that he be awarded an amount for originating this action and collecting damages and

civil penalties of 30% of the proceeds of any judgment or settlement plus costs, expenses, and attorneys' fees.

169.  Relator requests that the United State be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this complaint as the Civil False Claims Act, 31 U.S.C. §3729 et seq. provides.

170. Relator requests that civil penalties of the maximum allowed by law be imposed for each and every false claim that Defendant presented to the United States or its grantees.

171. Relator requests that reasonable attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing and pressing this case pursuant to 31 U.S.C. §3729(a)(3)(B) be awarded.

172. Relator requests that the Court grant permanent injunctive relief to prevent any recurrence of the improper actions and False Claims for which redress is sought in this complaint.

173. Relator requests an award of pre-judgment and post-judgment interest, as appropriate, at the highest rate allowed by law.

174. Relator and the federal government request such other relief, both in law and equity, to which they are entitled.

175.  ***Demand for Jury Trial***.  Relator, on behalf of himself and the United States pursuant to Rule 38 of the Federal Rules of Civil Procedure, demands a jury trial on all claims alleged herein.

Dated: October 21, 2019

Respectfully submitted,

Lindsey Birdsong
Attorney for Relator
State Bar No. 02333615
Lindsey Birdsong, PC
211 E. Houston St.
Tyler, TX 75702
903.595.6297
Fax: 903.595.3630
lindsey@birdsonglaw.com

## CERTIFICATE OF SERVICE

A copy of this sealed pleading has been provided to the following representatives of the United States of America and the State of Texas on October 22, 2019.


U.S. Attorney Joseph Brown
110 N. College, Suite 700
Tyler, TX 75702

Assistant U.S. Attorney Nathan Kummerfeld
110 N. College, Suite 700
Tyler, TX 75702

Assistant U.S. Attorney James Gillingham
110 N. College, Suite 700
Tyler, TX 75702


U.S. Attorney General William Barr
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001


Texas Attorney General Greg Abbott
PO Box 12428
Austin, Texas 78711-2428


By:

Lindsey S. Birdsong